UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| JERRY MEAS, | ) | |
| Petitioner, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:15-cv-13234-GAO |
| OSVALDO VIDAL, | ) ) ) | |
| Respondent. | ) ) | |

REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS

December 7, 2017

BOAL, M.J.

On August 27, 2015, Jerry Meas, who is currently serving a life sentence in a Massachusetts correctional facility, petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Docket No. 1 (the "Petition"). In his Petition, Meas alleges that the trial court violated his Sixth and Fourteenth Amendment rights by limiting certain cross-examination at trial. Respondent Osvaldo Vidal ("Respondent") opposes the Petition.[1] Docket No. 20.

For the reasons set forth below, I recommend[2] that the District Judge DENY the Petition.

---

[1] The Petition also lists Massachusetts Attorney General Maura Healey as a respondent. Docket No. 1 at 2. However, a writ of habeas corpus should be "directed to the person having custody of the person detained." 28 U.S.C. § 2243. Accordingly, Attorney General Healey is not a proper respondent because she does not have custody of the Petitioner.

[2] On October 14, 2016, Judge O'Toole referred the instant case to the undersigned for a report and recommendation. Docket No. 27.

I.      PROCEDURAL HISTORY

On or about December 16, 2008, a jury found Meas guilty of murder in the first degree by deliberate premeditation and illegal possession of a firearm.[3]  S.A. at 250-53.  Meas was sentenced to life without parole and a concurrent four-to-five-year sentence for the gun violation.  S.A. at 8, 3106-07.

Meas filed a direct appeal on eight grounds, including that the trial judge erred in precluding cross-examination of a cooperating prosecution witness, Fernando Badillo, on the subject of bias in favor of the prosecutor's office.  S.A. at 21-23, 254.  On March 12, 2014, the Massachusetts Supreme Judicial Court ("SJC") affirmed Meas' convictions.  Commonwealth v. Meas, 467 Mass. 434 (2014); S.A. at 433-48.  The SJC held that the trial judge did not abuse his discretion in prohibiting questions about bias because (1) he did not bar questioning on the subject altogether, but rather allowed some questioning after holding a voir dire hearing on the subject; (2) the jury was not required to rely on Badillo's testimony to establish the salient facts, given other testimony and evidence; (3) the judge allowed Badillo's convictions to be raised for impeachment purposes; and (4) defense counsel's claims of bias were grounded only in speculation.  Meas, 467 Mass. at 450-51.

On March 26, 2014, Meas filed a petition for rehearing, which the SJC denied.  S.A. at 12, 426-32.  Meas subsequently petitioned the U.S. Supreme Court for a writ of certiorari, which was denied.  Meas v. Massachusetts, 135 S.Ct. 150 (2014).

On August 27, 2015, Meas filed the instant Petition.  Docket No. 1.  On November 23, 2015, Respondent filed an answer.  Docket No. 11.  Meas filed a memorandum of law in support

---

[3] Meas was also charged with being an armed career felon, but the Commonwealth entered a *nolle prosequi* on this charge.  Supplemental Answer ("S.A.") at 235.

of his Petition on March 14, 2016.  Docket No. 17.  Respondent filed his opposition on May 16, 2016.  Docket No. 20.  On August 5, 2016, Meas filed a reply brief.  Docket No. 26.

II.     FACTUAL BACKGROUND[4]

      The SJC found the following facts:

> Based on the Commonwealth's evidence, the jury could have found the following facts.  During the evening of June 13, 2006, the defendant went to a cookout at Nou's home in Lowell.  Fellow members of the Asian Boyz gang were present, including Chhay and [a juvenile with the street name "Silent"].  The defendant had a gun, which he passed around for people to see.
>
> The cookout was interrupted by a gunshot coming from the street in front of the house.  Nou later told the police that two automobiles—a blue Honda Civic and a red Acura—had passed by his house.  Nou relayed that someone in the red Acura had shot at him while he was holding his infant son.  Nou recounted also that, a few weeks before, someone had shot at his house.
>
> Sometime after the gunshot sounded, Nou drove the defendant, Chhay, and Silent to the store to purchase cigarettes [in a black Honda Accord].  He parked to the right of the front door, and the defendant and Chhay went inside.
>
> The victim, who was driving a red Acura and was accompanied in the front seat by San, and in the back seat by Pen, stopped at the store and parked in front of its door.  The black automobile was parked a few spaces over on the passenger's side of the red Acura.

Meas, 467 Mass. at 443-44 (internal citations and footnotes omitted).

> Inside the store, Badillo observed the defendant being loud and acting tough.  Badillo described the defendant as an Asian male with long dark hair worn in a ponytail.  Badillo observed that the defendant was wearing a bandana, black hat, black jacket, and dark-colored khaki pants.
>
> After the defendant left the store, he approached the victim's automobile, speaking to the victim as he approached.  The victim told the defendant to "calm down."
>
> Another passenger of the Honda, who was wearing a hat with a "B" on it, went to the passenger's side of the victim's automobile and asked San,

---

[4] Absent clear and convincing evidence to the contrary, the recitation of the facts by the SJC is presumed to be correct.  See 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002); Evans v. Thompson, 518 F.3d 1, 3 (1st Cir. 2008).

> "What up, Blood?" The defendant then raised a firearm and shot the
> victim. He tried to shoot the gun again, but it did not discharge and only
> made clicking noises. The defendant and the other individual returned to
> the black Honda and drove down Chelmsford Street.

Id. at 436-37 (internal citations omitted).

> [T]wo additional witnesses at trial . . . observed the events surrounding the
> shooting. The store clerk, Carlos Urrego,[5] saw two Asian men, both
> wearing blue, approach the victim's automobile; saw the man on the
> driver's side, who was wearing a baseball cap and had long black hair,
> pull out what appeared to be a silver gun from his belt area; heard
> gunshots; and saw the two men run to an automobile parked behind the
> victim's. Urrego telephoned 911 and directed Badillo to get the license
> plate number. Badillo wrote down the license plate number of the black
> automobile and gave it to Urrego.
>
> Nou testified that he saw the defendant shoot the victim and heard two
> shots.[6] The shots scared Nou, so he backed up his automobile to get ready
> to leave, and the defendant and Chhay jumped in. Once inside the
> automobile, the defendant said, "We got them slobs."[7]
>
> San transported the victim to a nearby hospital. The victim was
> pronounced dead at 11:16 p.m. He died as a result of a gunshot wound to
> the left side of his neck that passed through his chest and right lung, and
> exited his right upper arm area. Police responded to a telephone call from
> the store at about 11 p.m. A police officer took a piece of paper from
> Badillo that had what Badillo believed was the license plate number of the
> black automobile. The officer secured the scene and broadcasted the
> license plate "over the air."

Id. at 445 (internal citations omitted).

> Within minutes of the shooting and in response to a 911 telephone call,
> Lowell police officers stopped a black Honda Accord with a very similar
> license plate number to that which had been provided to the police.

\*\*\*

---

[5] Footnote 9 of the SJC'S decision, inserted here, stated: "Carlos Urrego was later brought to the location of the showup identification procedure, but he did not make any identifications."
[6] Footnote 10 of the SJC's decision, inserted here, stated: "Nou testified under a grant of immunity pursuant to G.L. c. 233, § 20E."
[7] Footnote 11 of the SJC's decision, inserted here, stated: "The term 'slob' is a derogatory term for a Blood gang member."

> The police decided to conduct showup identification procedures at the location where the black Honda Accord had been stopped. This area was near a liquor store parking lot, and flood lights from that store, as well as street lights, and lights from police cruisers on the scene, contributed to illuminating the location.
>
> \*\*\*
>
> At 11:20 p.m., Badillo was next taken to the showup. Badillo recalled receiving the advisements from the police and observing six to ten cruisers and six to eight police officers in the area of the identification. He was not pressured by the police to select anyone, and he identified the defendant based on the clothing he had observed earlier. Badillo stated that the defendant was "definitely him." Badillo was approximately two to three car lengths away when he made his identification of the defendant as the shooter.

Id. at 437-39 (internal citations omitted). The SJC found the following facts with respect to Badillo's testimony at trial:

> Prior to Badillo's testimony, defense counsel argued that he should be permitted to impeach Badillo with his prior convictions and evidence of bias. At the time of the shooting, Badillo had been charged with mayhem, assault and battery, and assault and battery causing serious bodily injury. Following the shooting, but before trial, Badillo, on May 25, 2007, pleaded guilty to the above-named charges and was placed on probation. Defense counsel asserted that Badillo was biased at the time he spoke with police about the shooting because of the pending charges. In addition, defense counsel argued that Badillo would be biased toward the prosecution during the trial testimony because he was on probation, which is subject to being revoked. The judge conducted a voir dire, at which Badillo testified that, when police questioned him about the shooting on June 13 and 14, 2006, he did not think that cooperation with the police would affect his pending case. The judge ruled that Badillo could only be impeached with his prior convictions, and defense counsel did so.

Id. at 449.

On cross-examination, Badillo confirmed that he had pleaded guilty to various crimes in May 2007. S.A. at 2321. Defense counsel cross-examined Badillo extensively on his memory of the night of the shooting, his location with respect to the automobiles, his subsequent

identification of Meas at the showup, and his meetings with the district attorney's office.  S.A. at 2311-21.

Several other witnesses who had been present at the scene of the crime testified for the prosecution at Meas' trial, including (1) Phalla Nou, Meas' friend who drove Meas away from the scene of the crime; (2) Vicheth San and (3) Vannika Pen, who were in the automobile with the victim at the time of the shooting; (4) Pedro Garcia Cardona, a bystander who was in the parking lot; and (5) Carlos Urrego, the clerk from the convenience store.  Meas, 467 Mass. at 439, 444-46.  In addition, the jury was shown video footage of Meas inside the store.  Id. at 444 n.5, 447.  The prosecution also presented evidence that the police recovered a gun from the automobile in which Meas was apprehended.  Id. at 446.  Testing indicated that three discharged cartridge casings from the scene of the crime, outside Nou's home, and Nou's automobile, and a spent projectile from inside the victim's car all came from the recovered gun.  Id.

### III.  HABEAS CORPUS STANDARD OF REVIEW

The AEDPA presents a "formidable barrier" limiting the availability of habeas relief where state courts have adjudicated the merits of a prisoner's claims.  Burt v. Titlow, 134 S.Ct. 10, 16 (2013).  Meas may not obtain federal habeas relief under 28 U.S.C. § 2254(d) unless he can show that the SJC's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  In other words, state court decisions merit substantial deference.

As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof.  Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  If a state court's decision "was reasonable, it cannot be disturbed."  Hardy v.

Cross, 565 U.S. 65, 72 (2011); see Parker v. Matthews, 567 U.S. 37, 38 (2012) (emphasizing federal habeas courts may not "second-guess the reasonable decisions of state courts" (internal quotation and citation omitted)). When applying this strict standard, a court must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Miller–El v. Cockrell, 537 U.S. 322, 340–41 (2003).

The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002); cf. Harrington, 562 U.S. at 100 ("§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference). For a habeas petitioner to prevail under this daunting standard, the state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court. Williams v. Taylor, 529 U.S. 362, 404–05 (2000); see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).

However, decisions from circuit courts "may help inform the AEDPA analysis to the extent that they state the clearly established federal law determined by the Supreme Court." Grant v. Warden, Me. State Prison, 616 F.3d 72, 79 n.5 (1st Cir. 2010) (quotation omitted). "In addition, factually similar cases from the lower federal courts may inform a determination of whether a state court decision involves an unreasonable application of clearly established Supreme Court jurisprudence, providing a valuable reference point when the relevant Supreme Court rule is broad and applies to a kaleidoscopic array of fact patterns." Id. (internal citations and quotations omitted).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams, 529 U.S. at 405, or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Id. at 406 (internal citation omitted).

The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407. It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles, 556 U.S. at 122.

IV. DISCUSSION

Meas argues that his Sixth and Fourteenth Amendment rights were violated when the trial court precluded his counsel from cross-examining Badillo on potential bias towards the government stemming from Badillo's criminal history. Docket No. 17 at 2-3. The Court disagrees.

The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. An accused person's Sixth Amendment right to confront witnesses against him is a

fundamental right "made obligatory on the states by the Fourteenth Amendment." Pointer v. Texas, 380 U.S. 400, 403 (1965) (quotation omitted).

"Confrontation means more than being allowed to confront the witness physically. . . . [A] 'primary interest secured by [the Confrontation Clause] is the right of cross-examination.'" Davis v. Alaska, 415 U.S. 308, 315 (1974) (quoting Douglas v. Alabama, 380 U.S. 415, 418 (1965)). Cross-examination is crucial because it is "the principal means by which the believability of a witness and the truth of his testimony are tested." Id. at 316. "The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony." Id. (citation omitted). In particular, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." Id. at 316-17 (citations omitted).

Although cross-examining counsel has traditionally been allowed to impeach or discredit the witness by revealing possible biases or ulterior motives, cross-examination is "[s]ubject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation." Id. The right to cross-examine is not absolute, however. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see also Abram v. Gerry, 672 F.3d 45, 49 (1st Cir. 2012). A criminal defendant does not have "license to cross-question a prosecution witness concerning every conceivable theory of bias, regardless of the prevailing circumstances." Bui v. DiPaolo, 170 F.3d 232, 242 (1st Cir. 1999). Rather, in interpreting Van Arsdall, the First Circuit has concluded that the "Confrontation Clause is satisfied as long as the

defendant is given a fair chance to inquire into a witness's bias." Id. (collecting cases). A defendant will not be deprived of his right to inquire into a witness' possible bias "if a trial court legitimately determines that his cross-examination is inappropriate." Id. (citing Van Arsdall, 475 U.S. at 679).

To determine if a trial court's limitation on cross-examination constitutes a violation of the Confrontation Clause, Van Arsdall sets forth a two-prong test. First, the reviewing court must determine whether the jury would have had a "'significantly different impression' of the witness's credibility" without the limitation. DiBenedetto v. Hall, 272 F.3d 1, 10 (1st Cir. 2001) (quoting Van Arsdall, 475 U.S. at 679-80). A trial judge cannot prohibit "otherwise appropriate cross-examination designed to show a prototypical form of bias" on the part of a witness that would expose the jury to facts from which they "could appropriately draw inferences relating to the reliability of the witness." Van Arsdall, 475 U.S. at 680 (quoting Davis, 415 U.S. at 318). Defense counsel must be afforded the opportunity "to establish a reasonably complete picture of the witness's veracity, bias, and motivation." Stephens v. Hall, 294 F.3d 210, 226 (1st Cir. 2002) (citation omitted).

The second element of the Van Arsdall test is whether the error was harmless, and if so, reversal is not warranted.[8] DiBenedetto, 272 F.3d at 10 (citing Van Arsdall, 475 U.S. at 681).

---

[8] Where a trial court committed a constitutional error, courts in the First Circuit disagree about the standard for the second prong of this two-prong test. In DiBenedetto and subsequent cases, courts have asked "whether the error was harmless beyond a reasonable doubt; if so, reversal is not warranted." DiBenedetto, 272 F.3d at 10 (citing Van Arsdall, 475 U.S. at 679-81); see also Knight v. Spencer, 447 F.3d 6, 13 (1st Cir. 2006); Bly v. St. Amand, 9 F. Supp. 3d 137, 162 (D. Mass. 2014), appeal docketed, No. 14-1490 (1st Cir. May 7, 2014). Other recent cases have used the Brecht standard for habeas review of a constitutional trial error, asking instead if the error "had substantial and injurious effect or influence in determining the jury's verdict." See Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993); Montanez v. Mitchell, No. 12-11882-FDS, 2014 WL 949602, at *4 (D. Mass. Mar. 10, 2014). However, a court need not reach the second element of the two-prong test unless it finds a constitutional error in the first prong. See, e.g.,

The trial judge, in exercising his discretion, did not prohibit altogether inquiry concerning Badillo's bias. Rather, the trial judge gave defense counsel extensive opportunity to cross-examine Badillo in general, and did not foreclose questioning about his convictions in particular. The trial judge allowed defense counsel to cross-examine Badillo on numerous other subjects and to raise his convictions before the jury for impeachment purposes. Thus, the jury was exposed to facts surrounding Badillo's convictions and could use those facts to draw its own inferences regarding his credibility and potential bias.[9] The SJC correctly found that the trial judge did not abuse his discretion in precluding inquiry concerning possible bias. See S.A. 2321.

The trial judge also conducted a voir dire hearing at which Badillo testified that the pending charges against him and subsequent imposition of probation did not influence his cooperation. Meas, 467 Mass. at 449. There was no showing that Badillo's trial testimony was inconsistent with any of his prior statements.

In addition, the SJC correctly noted that the jury was not required to rely on Badillo's testimony to establish the salient facts concerning the shooting. Besides Badillo's testimony, there was ample other evidence, including several other witnesses' testimony, that corroborated the same information about which Badillo testified. In particular, Meas' friend Nou and the victim's friend San identified Meas as the shooter; video footage verified Meas' presence at the

---

Cameron v. Dickhaut, No. 08-10781-RGS, 2009 WL 497396, at *5 n.3 (D. Mass. Feb. 27, 2009). In the instant case, this Court finds no constitutional error, and therefore need not resolve the question of which standard to apply.

[9] Meas relies heavily on Davis and Crawford v. Washington, 541 U.S. 36 (2004), to show that his Sixth and Fourteenth Amendment rights were violated. However, these cases are not precisely on point. In Davis, defense counsel was entirely precluded from questioning the witness about his conviction and probation. 415 U.S. at 313-14. In Crawford, the witness invoked marital privilege, eliminating any opportunity for cross-examination. 541 U.S. at 40. Therefore, Davis and Crawford are not sufficiently similar as to render erroneous the SJC's decision.

crime scene; and bullet casings and a spent projectile from the crime scene matched a gun found in the automobile in which Meas was arrested. See Meas, 467 Mass. at 439, 444-47. Accordingly, the SJC's decision was neither contrary to, nor an unreasonable application of, clearly established federal law.

## V. RECOMMENDATION

For the foregoing reasons, I recommend that the District Judge assigned to this case DENY the Petitioner Jerry Meas' Petition for Writ of Habeas Corpus.

## VI. REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Phinney v. Wentworth Douglas Hosp., 199 F.3d 1 (1st Cir 1999); Sunview Condo. Ass'n v. Flexel Int'l, Ltd., 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir. 1993).

                                        /s/ Jennifer C. Boal
                                        JENNIFER C. BOAL
                                        United States Magistrate Judge